## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

**HEATHER VERONICA BOWYER,**

    **Plaintiff,**

**vs.**                            **CIVIL ACTION NO. 5:19-CV-00115**

**ANDREW SAUL,**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered February 15, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 17, 18)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 17), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 18); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

## Procedural History

The Plaintiff, Heather Veronica Bowyer (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on March 3, 2015 and alleged that her disability began on March 2, 2015, because of "[e]xtreme anxiety, severe depression, panic attacks, bereavement issues, [s]ocial anxiety, breakes [*sic*] out in a rash, [and] cannot sleep."[1] (Tr. at 255-256, 257-263, 264-269, 285) Her claims were initially denied on April 20, 2015 (Tr. at 144-154, 155-165) and again upon reconsideration on July 22, 2015. (Tr. at 167-177, 178-184) Thereafter, Claimant filed a written request for hearing on September 14, 2015. (Tr. at 185-186)

An administrative hearing was held on August 21, 2017 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 81-109) On September 25, 2017, the ALJ entered an unfavorable decision. (Tr. at 55-73) On November 20, 2017, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 251-254) The ALJ's decision became the final decision of the Commissioner on December 17, 2018 when the Appeals Council denied Claimant's Request. (Tr. at 1-7)

On February 14, 2019, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant, (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (ECF No. 17); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 18) Consequently, this matter is fully briefed and ready for

---

[1] In subsequent Disability Reports submitted at the initial and reconsideration levels, Claimant alleged that she experienced "[i]ncreased mood swings, anxiety, depression, panic attacks, and dizziness" (Tr. at 308) as well as "nausea . . . shortness of breath, diarrhea, constipation, weight gain, and loss of vision." (Tr. at 325)

resolution.

**Claimant's Background**

Claimant was 44 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 66) Claimant has a high school education and later obtained an associate's degree in criminal justice. (Tr. at 96) She last worked as a home health aide in March 2015; she stated that she is unable to work "because I can have panic attacks or fits of rage anytime." (Tr. at 104, 286, 287, 292)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f),

416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

4

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 of this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the

technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

### Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through June 30, 2019. (Tr. at 60, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of March 2, 2015. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: generalized anxiety disorder; panic disorder; major depressive disorder; and adjustment disorder. (Tr. at 61, Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels", with the following caveat:

> However, she is limited to performing simple, routine, repetitive tasks with no more than occasional interaction with coworkers and supervisors. The claimant can have no direct contact with the public as a core job function. There should be no team work or production quota-type work.

(Tr. at 64, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing any of her past relevant work. (Tr. at 66, Finding No. 6) In addition to Claimant's age, education, the immateriality of the transferability of job skills, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 7-

10) Finally, the ALJ determined Claimant had not been under a disability from March 2, 2015 through the date of the decision. (Tr. at 67, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ's analysis concerning whether Claimant's impairments met or equaled the requirements of Listing 12.05B or 12.05C is flawed because he gave only a cursory explanation for rejecting Dr. Bennett's opinion with regard to 12.05B criteria, and totally ignored his opinion with regard to 12.05C criteria. (ECF No. 17 at 6) Claimant asserts this error was compounded when the ALJ referred to Dr. Owen's testimony concerning 12.05B that contradicted Dr. Bennett's opinion despite the fact this testimony was outside of Dr. Owen's expertise. (Id.) These reversible errors frustrate meaningful review, requiring remand. (Id. at 7-8)

In response, the Commissioner argues that contrary to Claimant's assertion, Dr. Bennett ultimately testified that there was not enough evidence for him to opine that her impairments met Listing requirements, and that his opinion is consistent with the other opinions of record. (ECF No. 18 at 12) Further, the evidence of record did not demonstrate that Claimant had an impairment that met a Listing. (Id. at 14-18) Substantial evidence supports the ALJ's decision and this Court should affirm. (Id. at 18)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Claimant Self-Reports:

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

With regard to her daily activities, Claimant stated that she only sleeps for small periods of time at night. (Tr. at 293) She stated that she wakes up early, have coffee and then try to listen to music or watch a movie. (Id.) She indicated that "mostly I start worrying about my kids & other things." (Id.) She would sit in her apartment all day unless she has a doctor appointment. (Id.) She claimed a general lack of desire to do everyday activities. (Tr. at 293-294) She also alleged that anxiety prevents her from leaving the house alone. (Tr. at 295)

Mental Health Treatment Records:

Claimant treated with Hassan Jafary, M.D., of Beckley Psychiatric Services during the relevant period, mainly for medication management. On March 13, 2015, ten days after her alleged onset date, Claimant reported to Dr. Jafary, "I am doing a little bit better." (Tr. at 362) On her mental status examination, Dr. Jafary observed "some anxiety. Otherwise, looks a little bit better th[a]n before, but social anxiety is still bothering her. Mood slightly better depression wise. The patient denies suicidal or homicidal ideation. The patient denies auditory or visual hallucinations. Insight and judgment are intact." (Id.)

On March 25, 2015, Claimant presented with an anxious mood and labile effect; her mental status examination was normal as Claimant was observed to be calm, alert and oriented to time, person and place, normal speech, good insight, good judgment, no suicidal or homicidal ideations, and no hallucinations or delusions. (Tr. at 363) It was noted that she continued to have trouble going out due to social anxiety. (Id.) On April 13, 2015, Dr. Jafary observed Claimant as "calm and alert;" psychiatrically stable on her medication; and with a mental status examination within normal limits. (Tr. at 364) Claimant reported doing "okay" at her next visit on May 11, 2015. (Tr. at 365) Dr. Jafary noted there was no change in her mood and she appeared calm with an

appropriate affect, and she was stable on her medication. (Id.)

Throughout the rest of 2015, Claimant's mental status examinations were entirely normal and Dr. Jafary found her to be psychiatrically stable on her medications. (Tr. at 445-447, 449, 451-452, 454, 464) In August 2015, she reported to be "doing well." (Tr. at 447) In September 2015, Claimant told Dr. Jafary that she had been "having a good month." (Tr. at 449) Dr. Jafary found her memory and recall "intact" in both November and December 2015. (Tr. at 452-454)

On January 4, 2016, Claimant continued to be psychiatrically stable, not reporting any current problems, and with normal mental status examinations. (Tr. at 456) She admitted to a "mild" depressive mood and a "mild" feeling of anxiety, and her memory and recall were noted to be "intact." (Id.) On February 3, 2016, she again admitted "mild" depression and anxiety, but Dr. John Lilly (a colleague of Dr. Jafary) described her mood as "euthymic" and her affect as "appropriate." (Tr. at 458) Her memory and recall were "intact." (Id.)

On March 2, 2016, Claimant complained to Dr. Lilly of memory problems and dizziness after a motor vehicle accident. (Tr. at 460) She reported no other problems. (Id.) Her mental status examination was normal, including her memory/recall, which Dr. Lilly described as "intact." (Id.) Claimant had normal mental status examination results throughout 2016, including on March 29, April 4, May 3, June 2, July 5, August 4, September 2, September 30, October 28, November 28, and December 28, 2016. (Tr. 462, 493-502) During each of these examinations, her memory was "intact." (Id.)

Notwithstanding the objective findings of an "intact" memory and recall, Claimant complained of memory issues since her motor vehicle accident in February during her June 2, 2016 and August 4, 2016 appointments. (Tr. 495, 497) She also complained of increased anxiety on

April 4, June 6, August 4, and September 2, 2016. (Tr. at 460, 495, 497) Her report of increased anxiety in August 2016 coincided with a decrease of her Xanax since her last visit. (Tr. at 497) Dr. Jafary noted "[r]efer to a neurologist for post concussion syndrome." (Id.)

In 2017, Claimant continued to show an "intact" memory when examined at Beckley Psychiatric Services at each visit except once. (Tr. at 33, 37, 75, 77, 79, 533, 535, 537, 539) During a visit on December 7, 2017, Dr. Jafary described Claimant as "forgetful." (Tr. at 41-42) In October 2017, however, she denied any memory loss to Dr. Jafary. (Tr. at 37) She complained of a rash, which she believed was anxiety-induced. (Tr. at 33, 79, 531) Her mental status examinations were normal through March 2017. (Tr. at 531, 535, 537, 539)

In July 2017, Dr. Jafary observed that Claimant had a depressed mood and flat affect; Claimant reported having "a lot of black outs." (Tr. at 75) In August 2017, she had an "anxious mood" but an otherwise normal mental status examination. (Tr. at 77) Dr. Jafary noted that her increased anxiety and panic attacks coincided with a decrease of her valium. (Id.) Claimant reported anxiety and depression to Dr. Jafary several times during the second half of 2017. (Tr. at 37, 41, 43)

Claimant told Dr. Jafary that she had anxiety related to relationship issues in January 2018. (Tr. at 45) She also told her doctor she was to visit a neurologist "so she can get disability." (Id.) Her mental status examination findings were normal except for a "little bit" of anxiety and a labile affect; her memory/recall was "intact." (Id.) By February, she reported her mood was "good" and had no problems other than complaints of anxiety and "picking at her skin." (Tr. at 47) Claimant continued to receive normal mental status examination results throughout 2018 (well-groomed, alert and oriented, euthymic mood, appropriate affect, normal speech, logical and goal-directed

thought process, no suicidal/homicidal ideations, no hallucinations/delusions, good insight and judgment, intact memory and recall, intact judgment, good concentration and attention) (Tr. at 10, 13, 17, 21 49, 51, 53) but did display an anxious or depressed mood and labile affect on a couple occasions (Tr. at 49, 51).

Records Related to Motor Vehicle Accident:

Claimant was involved in a motor vehicle accident in February 2016. (Tr. at 367) She complained of right foot pain, vomiting, and a neck contusion. (Tr. 367, 389) A CT scan of her head was unremarkable. (Tr. at 426) A CT scan of her cervical spine was unremarkable. (Tr. at 428) A CT scan of her thoracic spine showed an old compression fracture at T-7. (Tr. at 420)

On March 15, 2016, Claimant presented to Georgianna Richards, M.D., a neurologist, complaining of memory loss and possible seizures after the motor vehicle accident. (Tr. at 429) Dr. Richards observed Claimant having "normal" orientation to time, place and person, recent and remote memory, attention span, concentration and fund of knowledge. (Tr. at 430) Dr. Richards also observed, "Language function is normal … Speech is normal." (Id.) Claimant received a score of 22 on the Montreal Cognitive Assessment (MCA) administered by Dr. Richards. (Tr. at 430, 432) Dr. Richards ordered an EEG, the results of which were normal. (Tr. at 433)

State Agency Consultant Opinions:

At the initial level, Rosemary L. Smith, Psy. D., opined with respect to the "B" criteria for listed mental impairments, that Claimant had only mild difficulties in (i) activities of daily living, (ii) maintaining social functioning, and (iii) maintaining concentration, persistence and pace. (Tr. at 114) She found one or two episodes of decompensation. (Tr. at 121) Dr. Smith found no evidence to establish the presence of "C" criteria. (Tr. at 114) She opined that Claimant was not

disabled. (Tr. at 115) In reaching her opinions, Dr. Smith relied on medical records from Beckley Psychiatric Services through April 2015 and Bowyer's allegations from her Adult Function Report. (Tr. at 113-114) Dr. Smith noted that this was a "durational denial" and that Claimant's symptoms "should improve to a non-severe level within one year." (Tr. at 114) On reconsideration, John Todd, Ph.D., affirmed Dr. Smith's findings, including her determination that Claimant was not disabled. (Tr. at 130-132)

**The Administrative Hearing**

Gary Bennett, Ph.D., Psychological Expert Testimony:

Dr. Bennett, a clinical psychologist, testified that he could not reconcile Claimant's total score of 22, below the 26 threshold, from the Montreal Cognitive Assessment with Dr. Richards's contemporaneous findings of normal orientation to time, place and person; normal recent and remote memory; normal attention span; and normal concentration. (Tr. at 89) Dr. Bennet explained that this score "was in the range that would suggest some type of cognitive limitation or some kind of possibility related to traumatic brain injury." (Id.) He stated there is a "disconnect" in Dr. Bennett's finding no deficits where the test score indicates some kind of deficit. (Id.)

Based on his review of the records, Dr. Bennett testified that Claimant has "panic disorder and major depressive disorder, [and] generalized anxiety disorder." (Id.) With respect to whether Claimant's mental impairments met or medically equaled a listed impairment, Dr. Bennett testified:

> . . . and this memory thing for me is sort of from my perspective, the make or break because when I look at the B criteria and I think in B-2, interacting with others, we do have evidence that I would think indicate a marked limitation due to the anxiety, panic attacks in public, trouble going out due to social anxiety, but understanding, remembering or supplying information, yeah, I think that does rise to a marked level if these issues of memory impairment, you know, are supported. But I don't

– the evidence is a little but – it's a little bit lacking in my opinion.

(Tr. at 89-90)

Dr. Bennett explained that he was "not exactly sure how to go with [the domain of] understanding, remembering and applying information." (Tr. at 90) He noted that Claimant had two years of college and the medical records preceding the accident described her memory as intact and her concentration, persistence and pace as fair or good, resulting in a mild limitation. (Id.) He testified that most of Dr. Jafary's notes "don't really go very far in terms of describing what I would consider to be a listing level of impairment in adapting or managing oneself." (Id.)

Dr. Bennett testified that, "Certainly anxiety does come into play in terms of doing things outside of her home. I had that as a moderate limitation, judge. So I don't know. If given this sort of shady area with B1, it could be that this would be an equals 12.06. But I don't really have enough in my opinion to say she would meet." (Id.)

With respect to the "C criteria", Dr. Bennett testified that it was possible given Claimant's anxiety issue and that her testimony might flesh that out a little more. (Tr. at 91) He testified that if someone is having severe anxiety that prevents them from being able to function outside the home, then "C criteria would come into play." (Id.)

<u>David Owen, M.D., Medical Expert Testimony:</u>

Dr. Owen synthesized Claimant's medical records, including her complaints of memory loss, dizziness, and headaches after her motor vehicle accident where she likely suffered a concussion. (Tr. at 92) He noted Claimant had a normal EEG, a normal CT scan, and a normal compression fracture at T7 with no definite symptoms. (Tr. at 92-93) Dr. Owen testified that Claimant's physical impairments did not meet or medically equal a specific listing. (Tr. at 93)

Although "a little out of [his] field", he also testified that Claimant's alleged memory problems were not documented in the record. (Id.)

Claimant Testimony:

Claimant testified that she lives with a friend and her daughter. (Tr. at 95) She drove to the hearing and has a valid driver's license. (Tr. at 95-96) When asked about the motor vehicle accident in February 2016, she testified that she had been up since 12:30 that previous morning and went to her appointment with Dr. Jafary. (Tr. at 97) She stated that she reported feeling sick and when she left to go to the pharmacy she recalls driving past a restaurant and then coming to in the emergency room. (Tr. at 97-98) She testified that she was told she went through an intersection and crashed into somebody's foundation and was incoherent at the scene; she was taken to the hospital via ambulance and she stayed there for about three days. (Tr. at 98)

Claimant testified that she got up early and drank coffee and just sits most of the day. (Tr. at 99) She testified that she does not go anywhere except to doctor's appointments. (Id.) She can take care of her personal hygiene, but does not fix simple meals or do light chores, but thinks she probably could. (Id.) Her friend takes care of her. (Tr. at 100) Claimant testified that she watches a lot of TV, such as true crime shows. (Id.)

Claimant testified that she cannot work because she "can't go into public." (Tr. at 101-102) She explained that it is "extremely hard" for her and that she gets "panicky" and feels like she's shaky and can't breathe. (Tr. at 102) She also endorsed feeling sick and her arms start to itch and she breaks out; she also fears that she will get robbed. (Id.) Claimant could not explain why Dr. Jafary's records indicate that she's stable, but attributed that to the medication. (Id.)

14

Claimant testified that she cannot go grocery shopping because she "can't go to the store" and that she has not done her own grocery shopping at all since even prior to March 2015. (Tr. at 103) She explained that she did not go grocery shopping when she was working "for convenience", her roommate or her mother would pick up the things she needed, however, she "couldn't" have done her own shopping then because of her anxiety. (Tr. at 103-104) She testified that she started treatment for anxiety in 2014, and towards the end of her employment, she was "struggling" with social interactions and it was getting extremely hard for her to continue working as a caregiver. (Tr. at 104)

Patricia Posey, Vocational Expert ("VE") Testimony:

Given the first hypothetical of an individual with Claimant's age, education, vocational profile, without physical limitations, but limited to simple, routine, repetitive tasks, could have occasional contact with public, coworkers and supervisors, without contact with the public as a core job function or team work or production quota type work, the VE opined that Claimant could not perform her past work, but could perform other jobs such as a sorter, produce weigher, or a price marker, which are classified as medium, light and light, respectively. (Tr. at 106-107) The VE also testified that if the hypothetical individual were off task 25% or more of the work day or work week, then the individual could not work. (Tr. at 107) The VE further opined that if such an individual would miss work at least two times a month due to symptoms from anxiety, then the individual would not be able to sustain gainful activity. (Tr. at 108)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

The issue before this Court concerns whether the ALJ explained his reasoning in finding Claimant's mental impairments did not meet or equal either B or C Listing criteria that is sufficient for meaningful review. Specifically, Claimant has argued that the ALJ committed reversible error when he disregarded Dr. Bennett's opinion concerning the "paragraph C" without explanation, *supra*.

As noted *supra*, the Listings requirements under paragraph B for 12.06 for anxiety and obsessive-compulsive disorders includes either an "extreme" limitation of one or "marked" limitation in two of the areas of mental functioning. Under "paragraph C", the Listing requirements provide:

Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychological support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b)[3]; *and*

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c)[4].

See, Pt. 404, Subpt. P, App. 1, 12.06C (*italics* in original).

In his discussion concerning the severity of Claimant's mental impairments, the ALJ noted Dr. Bennett's testimony that he considered treatment records dating back to 2014 from Dr. Jafary which included Claimant's diagnoses of generalized anxiety disorder, major depressive disorder, and panic disorder. (Tr. at 61-62) This included Dr. Bennett's review of Dr. Jafary's treatment

---

[3] Per 12.00G2b:

> The criterion in C1 is satisfied when the evidence shows that you rely, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of your mental disorder (see 12.00D). We consider that you receive ongoing medical treatment when the medical evidence establishes that you obtain medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for your medical condition. We will consider periods of inconsistent treatment or lack of compliance with treatment that may result from your mental disorder. If the evidence indicates that the inconsistent treatment or lack of compliance is a feature of your mental disorder, and it has led to an exacerbation of your symptoms and signs, we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by this paragraph.

[4] Per 12.00G2c:

> The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

notes specifically detailing Claimant's reported issues with activities of daily living and her anxiety and panic symptoms, and that her symptoms appeared to rebound as a result of benzodiazepine weaning. (Tr. at 62, referencing Exhibits 1F, 4F, 6F, 7F, and 10F[5]) With regard to the "paragraph B" criteria, the ALJ noted the following:

> In evaluating the "paragraph B" criteria, Dr. Bennett indicated that documentation supporting a marked limitation in the claimant's ability to understand, remember, and apply information was lacking. He did find that her ability to interact with others is markedly limited based upon her reports of social anxiety and panic attacks in public. The claimant's ability to concentrate, persist, or maintain pace was described in the record as fair to good, so Dr. Bennett assigned a mild limitation in this area. He reported a moderate limitation in her ability to adapt or manage oneself due to difficulties with daily living resulting from anxiety. Dr. Bennett opined that the claimant did not meet the requirements of a listing, and was unwilling to definitively state that she equaled a listing given the lack of documentation within the medical record.

(Tr. at 62) The ALJ did not specifically reference Dr. Bennett's opinion with respect to "paragraph C" criteria, but provided the following assessment:

> As a specialist in the field of mental health who frequently provides expert testimony in disability cases, Dr. Bennett is well versed in the Social Security Regulations and the requirements of listing level impairments. Furthermore, he was provided the opportunity to review the mental health record in its entirety. Therefore, his opinion is afforded significant weight. However, the undersigned notes Dr. Bennett's ambivalence concerning the degree of memory deficiencies experienced by the claimant. In reviewing the evidence, including the testimony of Dr. Owen which is discussed later in this decision, the undersigned finds no more than moderate limitations in the claimant's memory, as discussed below.

(Id.) In addition to Dr. Bennett's testimony, the ALJ reviewed the evidence of record with respect to each of the domains of mental functioning pursuant to "paragraph B" criteria, beginning with his determination that Claimant had a moderate limitation in understanding, remembering, or

---

[5] These Exhibits pertain to Dr. Jafary's office treatment records dated March 27, 2014 through May 11, 2015 (Tr. at 347-365), January 15, 2015 through March 4, 2016 (Tr. at 435-474), April 4, 2016 through December 28, 2016 (Tr. at 493-502), March 29, 2016 through March 17, 2017 (Tr. at 503-540), and March 29, 2016 through March 17, 2017 (Tr. at 547-584), respectively. It is noted that these records are often duplicative.

applying information. (Id.) The ALJ based this finding on: Claimant obtained an associate's degree in criminal justice; Dr. Jafary's treatment notes indicated Claimant's memory was intact before and after her 2016 motor vehicle accident; Dr. Jafary described Claimant's insight and judgment intact and good; and Dr. Richards' report that Claimant was fully oriented with a normal fund of knowledge and normal recent and remote memory. (Id.) Next, the ALJ determined Claimant had a marked limitation in her ability to interact with others, noting her testimony about her severe social anxiety and having panic attacks in public that was corroborated by the treatment records. (Id.) In concentrating, persisting or maintaining pace, the ALJ found Claimant had a mild limitation, again noting Dr. Jafary's notes that consistently found her to be alert and oriented and her concentration fair to good. (Tr. at 63) The ALJ further noted that Dr. Richards determined Claimant had normal concentration and attention span during her evaluation, and the ALJ acknowledged that during Claimant's hospitalization from her motor vehicle accident, hospital personnel indicated she was alert and answering questions appropriately. (Id.) Finally, with regard to adapting or managing oneself, the ALJ determined Claimant had a moderate limitation, noting that although the records referenced Claimant's limitations in daily activities due to anxiety, Claimant testified that she can independently care for her personal hygiene and treatment notes consistently described her as well-groomed. (Id.) Further, the ALJ noted that Claimant had repeatedly denied suicidal and homicidal ideation and there was no evidence of hallucinations or delusions, that Claimant's affect was also consistently described as appropriate, and she reported compliance with her medication. (Id.)

Regarding "paragraph C" criteria, the ALJ found that the evidence failed to satisfy same. (Id.) The ALJ noted "[t]he record does not establish that the claimant has demonstrated a minimal

capacity to adapt to changes in her environment or to demands that are not already part of the claimant's daily life." (Id.) Additionally, the ALJ noted that the record contained no evidence that Claimant had been hospitalized for psychiatric reasons and that she had attended counseling on a regular basis and that Dr. Jafary had deemed her to be psychiatrically stable. (Id.)  In  addition  to his review of Dr. Bennett's opinion testimony, the ALJ considered the opinions provided by the State agency psychological consultants, noting that neither concluded that Claimant's mental impairments met or equaled a Listing, and they specifically found the evidence did not establish the presence of "paragraph C" criteria. (Id.)

The ALJ considered the opinion testimony provided by Dr. Owen, noting that he opined Claimant's physical impairments did not result in functional limitations that met or equaled Listing requirements. (Tr. at 65-66) The ALJ further noted that Dr. Owen opined "that the medical record failed to support memory problems." (Tr. at 66)

In addition to the opinion evidence, the ALJ reviewed Claimant's testimony: that she stopped working in March 2015; that she had a motor vehicle accident in 2016 and was subsequently hospitalized for a few days; that she primarily watches TV throughout the day; that she is unable to work due to panic attacks, "stating that she becomes shaky, has difficulty breathing, feels dizzy and nauseous, and sometimes bursts into tears." (Tr. at 64) The ALJ also noted that Claimant testified that "Dr. Jafary's repeated notes that her symptoms were stable dealt with the way her medication controlled her anger issues." (Id.) The ALJ also reviewed the medical evidence with respect to Claimant's mental health treatment, expressly noting that records supported Claimant's testimony that she developed a rash which was associated with her panic attacks. (Tr. at 65) The ALJ acknowledged that Dr. Jafary "has consistently reported the claimant

20

to be psychiatrically stable at almost every visit subsequent to her alleged onset date." (Id.) The ALJ noted that although Claimant reported her anxiety interferes with her daily activities, he also recognized that she cared for her personal hygiene, "drove up to 20 miles per week" and had driven to the hearing, and that she is able to perform household chores or prepare meals. (Id.)

      The foregoing suggests that the ALJ provided ample explanation for his determination that Claimant's mental impairments did not satisfy either "paragraph B" or "C" criteria. Significantly, no expert or provider opined that Claimant met or medically equaled Listing requirements, which the ALJ also noted in his decision. (Tr. at 62, 63, 66) The ALJ acknowledged Dr. Bennett's opinion that the evidence did not rise to the requirements of listing level impairments, as well as Dr. Bennett's "unwilling[ness] to definitively state that [Claimant] equaled a listing given the lack of documentation within the medical record." (Tr. at 62) Although the ALJ did not specifically cite Dr. Bennett's opinion with regard to "paragraph C" criteria, the transcript from the administrative hearing mirrors the ALJ's findings:

> ALJ:      Thank you, Dr. Bennett. Any evidence of the C criteria?
>
> Dr. Bennett:  Well, again, judge, that's possible given this anxiety issue. As Ms. Heisman, you know, indicated with the testimony[6], that might flesh that out a little more. If someone is having severe anxiety that prevents them from being able to function outside the home then I think the C criteria would come into play.

(Tr. at 90-91) Similar to Dr. Bennett's testimony with respect to the "paragraph B" criteria, the evidence was lacking in the medical records themselves that supported a finding that Claimant's mental impairments met Listing requirements, although the lack of medical evidence may be "flesh[ed] out" with Claimant's testimony. In short, the ALJ's characterization of Dr. Bennett's

---

[6] Dr. Bennett is referring to Claimant's attorney's opening statement which concerned Claimant's anticipated testimony that although Dr. Jafary had noted Claimant was psychiatrically stable, Claimant still complained of having symptoms and that she "lead a very controlled life now at this point." (Tr. at 87)

opinion as "unwilling to definitively state" and "ambivalen[t]" with regard to Claimant's listing level impairments is a fair assessment. (Tr. at 62) Nevertheless, the ALJ reviewed not only Claimant's testimony, but also her treatment records with Dr. Jafary which the ALJ referenced at length in his decision which provides sufficient explanation for the ALJ's step three findings.

Further, though Claimant may disagree with the ALJ's determination that her mental impairments did not meet Listing requirements, this Court does not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). The ALJ herein provided an appropriate discussion and reconciliation of the conflicting evidence of record that the ALJ found supportive of his findings necessary for meaningful review, rendering remand unnecessary. Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016) Accordingly, the undersigned **FINDS** that the ALJ's step three determination that Claimant's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments is supported by substantial evidence.

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (ECF No. 17), **GRANT** the Defendant's request to affirm the decision (ECF No. 18), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 12, 2019.

Omar J. Aboulhosn
United States Magistrate Judge